Argued and submitted December 3, 1979,
reversed and remanded March 4, 1980

STATE OF OREGON,
*Respondent,*
*v.*
DELL KENNETH FOSTER, JR.,
*Petitioner.*

(CA 11775, SC 26368)

607 P2d 173

David L. Slader, Portland, argued the cause and
filed briefs for petitioner.

Thomas Denney, Assistant Attorney General,
Salem, argued the cause for respondent. On the brief
were James A. Redden, Attorney General, Walter L.
Barrie, Solicitor General, and Catherine Allan, Assist-
ant Attorney General, Salem.

HOWELL, J.

## HOWELL, J.

The issue in this criminal appeal is whether the defendant's waiver of his right to have an attorney present during custodial interrogation was voluntarily made.

Defendant was arrested at his residence on April 10, 1978 at 11:15 p.m. The arresting officers charged him with kidnapping in the first degree and extortion and advised defendant of his *Miranda* rights.[1] The officers brought him to the police station where, at approximately 12:15 a.m., they again advised him of his rights, and defendant signed an Advice of Rights form indicating that he understood his rights. Defendant told the police officers that he did not want to discuss any matter without having an attorney present.

From 12:15 a.m. until approximately 4 a.m. the morning of April 11, 1978, police detectives spoke with defendant, "giving him an opportunity to waive his right to have an attorney present," and hoping to get him to make some incriminating statements. They presented him with the evidence they had accumulated which connected him with the kidnapping. They told him that they knew of his self-incriminating admission to his ex-wife and that a van similar to hers had been involved in the kidnapping. They discussed the maximum penalties, the possibility of plea bargaining and the possibility of bail reduction. They suggested that defendant's prospects might be better if he cooperated with them in recovering the $100,000 ransom money and they stated that, in their opinion, assisting in the return of the money could have a bearing on the sentence and later parole. One detective described their efforts in the following words:

> " * * * We painted, quite frankly, a dark picture for him. That he might have an opportunity to, you know, bail himself out here a little bit and help himself."

[1] *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 LEd 2d 694 (1966).

[651]

While they advised defendant that it could be in his interest to talk, the detectives questioned him about the location of his brother, who was also a suspect in the case. They found a portion of a matchbook cover sticking out of one of his shoes, and they asked him if the telephone number written thereon belonged to his brother. Warning him that the ransom money should be recovered prior to trial, they asked him where the money was hidden.

Throughout the questioning, defendant was extremely upset. He told the detectives that he would be willing to discuss the case with them but that he wanted to talk to an attorney first. The detectives continued questioning defendant, telling him that his statements would not be admissible in court because he had not waived his rights, but also suggesting that he cooperate and waive his right to an attorney. Defendant repeated his request for an attorney three or four times during the course of the questioning. Nevertheless, defendant spoke with the detectives and said that he knew he was going to jail for a long time, that he did not want to incriminate his brother, that the phone number on the matchbook cover belonged to his brother, and that he did not know where the ransom money was hidden because his brother told him only that it was buried somewhere. The questioning ended at about 4 a.m. on April 11, and the defendant was booked and jailed.

A day later, on April 12 at 10:45 a.m., one of the detectives spoke with defendant in jail "to ask him to waive his right" to have an attorney present. Defendant had not yet seen an attorney and the detective was prepared to readvise defendant of his rights. But first the detective wanted to inform defendant of new developments in the case so that defendant could decide whether to waive his right to counsel. The detective told him that his brother had been arrested and that he had implicated defendant in the kidnapping and the receipt of some of the ransom money. The detective

said that he realized defendant had requested an attorney; he also said that in fact an attorney would advise defendant not to discuss the case. Then the detective asked defendant if he wanted to waive his right to have an attorney present. The detective told defendant he felt there was a good chance defendant would be convicted and that it would be to defendant's benefit to cooperate and try to recover the ransom money. After 15 minutes of reviewing the case, the detective again asked if defendant wanted to waive his rights.

Defendant then agreed to talk. He was uncertain whether the detective was telling the truth, so the detective requested a lawyer who was present in the building to witness the detective's statements. After hearing the detective's statements, the lawyer suggested to the defendant that he see an attorney. The detective advised defendant of his rights. Defendant agreed to waive his right to have an attorney present, signed a formal waiver to that effect, and proceeded to make a statement and answer questions.

The state conceded and the trial court held that the statements made by defendant during the first discussion with police on April 11 should be suppressed. The court denied the motion to suppress the matchbook cover and the evidence obtained therefrom. It also denied suppression of defendant's statements made on April 12.

Defendant was convicted of kidnapping in a trial before the court. Defendant appealed the trial court's partial denial of his motion to suppress, and the Court of Appeals affirmed the denial. 40 Or App 635, 596 P2d 572 (1979).

In *State v. Singleton,* 288 Or 89, 602 P2d 1059 (1979), this court extensively reviewed Oregon and United States Supreme Court decisions regarding waiver of the constitutional rights to remain silent and to consult with an attorney during a custodial interrogation. We need not elaborate on that discussion. In *Singleton* we said:

[653]

" * * * [When] a defendant, after arrest and upon being questioned by the police, exercises his right to remain silent and also informs the police of his desire to exercise his right to consult with an attorney, the police must 'scrupulously honor' those rights; that when in such a case it is contended by the state that the defendant has subsequently waived those rights there is a presumption that the waiver was involuntary and the state has a 'heavy burden' to demonstrate that the defendant knowingly and intelligently waived those rights; and that the determination whether there was such a waiver is to be made upon an inquiry into 'the totality of the surrounding circumstances.' We also hold that in such a case the question of waiver is not simply a question of historical fact, but one which requires the application of constitutional principles to the facts as found." 288 Or at 104.[2]

The trial court held, and the state concedes, that the police officers violated defendant's constitutional rights when they interrogated him on April 11 after he had asserted his rights to remain silent and to consult with an attorney. Therefore during the April 11 questioning the police did not "scrupulously honor" defendant's rights.

The Court of Appeals held that defendant's statements on April 12 (following his signed waiver) "were not the result of—and hence not tainted by—the earlier interrogation" on April 11. 40 Or App at 640. Our concern, however, is *not* with the voluntariness of defendant's statements on April 12, but with the voluntariness of defendant's signed *waiver* which preceded his statements. The actions of the police that resulted in defendant's statements on April 11

---

[2] *In State v. Singleton*, 288 Or 89, 602 P2d 1059 (1979), we particularly relied on *Fare v. Michael C.*, 442 US 707, 99 S Ct 2560, 61 L Ed 2d 197 (1979); *Brewer v. Williams,* 430 US 387, 97 S Ct 1232, 51 L Ed 2d 424 (1977); *Michigan v. Mosley,* 423 US 96, 96 S Ct 321, 46 L Ed 2d 313 (1975); *Miranda v. Arizona, supra n. 1; State v. Haynes,* 288 Or 59, 602 P2d 272 (1979); *State v. Whitewater,* 251 Or 304, 445 P2d 594 (1968); *State v. Sanford,* 245 Or 397, 421 P2d 988 (1966); *State v. Atherton,* 242 Or 621, 410 P2d 208, *cert. denied* 384 US 1025, 86 S Ct 1982, 16 L Ed 2d 1030 (1966).

amounted to an attempt to persuade defendant to waive his rights and to talk. We must therefore ascertain whether the police actions that had occurred on April 11 affected defendant's waiver on April 12.

In *State v. Mendacino*, 288 Or 231, 603 P2d 1376 (1979), we held that coercive police actions that had produced the defendant's first two inadmissible confessions were not effectively removed so that as a matter of law his third confession was involuntary. The defendant's first two confessions resulted when the police interrogated the defendant after he had asserted his rights to remain silent and to see an attorney. In analyzing the continued effect of *Miranda* violations, we said:

> " * * * We must determine whether the coercive effects of the earlier unlawful conduct had been effectively removed. The application of a 'tainted fruit of the poisonous tree doctrine' is not automatic, rather the application depends on an analysis of the total circumstances of each case. *United States v. Massey*, 437 F Supp 843 (Fla 1977). *Cf., Gilpin v. United States*, 415 F2d 638 (5th Cir 1969), *Harney v. United States*, 407 F2d 586 (5th Cir 1969)." 288 Or at 238.

In *Mendacino* we were concerned with the problem whether earlier unlawful coercive conduct affected the voluntariness of a defendant's later confession. In the instant case, we are concerned with the effect of prior unlawful conduct on the voluntariness of a defendant's waiver of constitutional rights. The analysis, however, is the same; we must inquire into the totality of the circumstances surrounding the series of police interrogations to determine whether the defendant in fact knowingly and voluntarily decided to forego his rights to remain silent and to have the assistance of counsel. *State v. Singleton, supra; Fare v. Michael C.*, 442 US 707, 99 S Ct 2560, 61 L Ed 2d 197 (1979). In *Mendacino* we looked at the totality of circumstances from the time the defendant was first detained and considered a suspect until the time he gave his third confession. 288 Or at 233-34, 238. In the instant case we

must look at the totality of circumstances from the time defendant was arrested and first interrogated until the time defendant signed the waiver.

The circumstances surrounding the police interrogation of defendant on April 11 and 12 indicate the police detectives persisted "in repeated efforts to wear down his resistance and make him change his mind." *Michigan v. Mosley,* 423 US 96, 105-06, 96 S Ct 321, 46 L Ed 2d 313 (1975). When the police continued to interrogate defendant for three and one-half hours on April 11 after he had asserted his right to have an attorney present, the police created the impression that the assertion of one's rights was meaningless. Similarly, when the detectives attempted to persuade defendant to waive his right to have an attorney present, without allowing defendant the right to counsel he had requested, they created the impression that the assistance of counsel would be meaningless.[3] The opinions offered by the detectives—that defendant's predicament was hopeless and that defendant would benefit if he cooperated—were intended to be, if not undue persuasion, at least substitutes for the legal advice the defendant was seeking from an attorney of his own.[4] This police conduct must be considered together with the circumstances that defendant was held in custody for over 30 hours, that the same detective was involved in both the April 11 and April

---

[3] It is anomalous that the police detectives characterized their efforts as "giving [defendant] an opportunity to waive his right to have an attorney present." By continuing their interrogation, they were denying defendant his right to have an attorney present. At the suppression hearing one of the detectives admitted on cross-examination, "The reason that I was there [on April 12] was to ask him to waive his right to that attorney, which he eventually agreed to do."

[4] At the suppression hearing the trial judge observed:

"* * * Does a police officer who has been told that a man wants to exercise his constitutional right have a duty to the police department or the public or to the Defendant or to the District Attorney or any interested group, * * * to try and talk the person out of asserting their rights, which is bascally what it amounts to in this case. They talked him out of it by showing him the helplessness of the situation * * *. [T]hey talked him out of his decision to assert a right to counsel, and I'm very disturbed. Very disturbed."

[656]

12 questionings, and that defendant was extremely upset. In sum, the police officers, by improper means, succeeded in persuading defendant to sign the waiver of his constitutional rights. Accordingly, we hold that defendant's waiver was not voluntarily made and was therefore invalid.

The defendant's motion to suppress statements made by defendant on April 12 should have been granted.

Reversed and remanded.